Kathryn S. GOODENBOUR, Appellant,

v.

Jay GOODENBOUR, Appellee.

No. 03–00–00713–CV.

Court of Appeals of Texas,
Austin.

June 29, 2001.

Jo Ann Merica, Phillips and Merica, P.C., Austin, for Appellant.

James A. Vaught, Edwin J. (Ted) Terry, Jr., Karl E. Hays, Austin, for Appellee.

Before Justices KIDD, B.A. SMITH and PURYEAR.

PURYEAR, Justice.

Appellant Kathryn S. Goodenbour appeals from a district court order granting appellee Jay Goodenbour's special appearance and dismissing Kathryn's suit for divorce in its entirety. *See* Tex.R. Civ. P. 120a. Kathryn brings two points of error challenging the district court's ruling regarding jurisdiction. In her first point of error, Kathryn argues the district court erred when it found that (i) it did not have

personal jurisdiction over Jay, (ii) Texas was not the last marital residence of the parties,[1] and (iii) the parties' children did not reside in Texas as a result of the acts or directives of Jay.[2] In her second point of error, Kathryn argues the district court erred when it dismissed her petition for divorce and held that it did not have jurisdiction over any issue therein. We will reverse the order and remand the cause for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Kathryn and Jay Goodenbour were married on August 2, 1980 and are the parents of two minor children. Before October 1996, Kathryn and Jay resided with their children in the state of Washington. On October 8, 1996, Jay moved to New Zealand to start a new job while Kathryn and the children remained in Washington. The plan was for Kathryn and the children to move to New Zealand after the Christmas break. At the end of 1996, however, Kathryn developed reservations about moving to New Zealand and decided to stay in Washington, at least until the children finished the school year. In July of 1997, Kathryn was offered a job in Texas. She accepted the job and moved to Austin in August 1997.

In March 1998, while Jay was with Kathryn and the children in Austin, they began looking for a house to buy because they had recently sold their house in Washington. Jay contends that he did not want to help Kathryn buy a house, but did so only to ensure that she and the children would be safe and happy. He still hoped to convince her to move to New Zealand.

Jay provided financial information in connection with the mortgage for the house and provided Kathryn with a power of attorney so she could close the sale in his name while he was on a business trip in Hong Kong. The Austin residence Kathryn and Jay purchased is held in both of their names.

After Kathryn and the children relocated to Austin, Jay returned to his family in Texas on at least five separate occasions, encompassing approximately forty days. One purpose of these trips was to "keep his marriage alive." Until December of 1998, Jay and Kathryn acted as an intact family and as husband and wife. They filed a joint 1998 tax return reflecting Austin as their residence.[3] For the same year, Jay filed a "nonresident" tax return in New Zealand.

In August 1999 Kathryn filed for divorce in Travis County. On April 20, 2000, Jay filed for divorce in Auckland, New Zealand. On May 9, Jay was served with citation in the Travis County divorce. Kathryn was served with papers in the New Zealand divorce, on May 13. On June 5, Jay filed his special appearance and original answer subject to special appearance in Travis County. On July 12, the Family Court in Auckland granted Jay's application for dissolution of the marriage but did not divide the property or award custody of the children. Jay's special appearance was heard and granted, on July 17. In its order granting Jay's special appearance, the Travis County district court found that (1) Jay's contacts with the state of Texas were insufficient to confer either general or specific jurisdiction over him and (2)

---

**1.** *See* Tex. Fam.Code Ann. § 6.305 (West 1998).

**2.** *See id.* § 102.011 (West Supp.2001).

**3.** Kathryn's affidavit states that they filed a joint 1998 tax return although there is not a copy of the return in the record. Jay's affidavit does not dispute this, and he admits in his brief to this Court that he filed jointly with Kathryn.

Kathryn had failed to establish, pursuant to Texas Family Code sections 6.305(a)(1) and (a)(2), that Texas is the last marital residence of the parties. *See* Tex. Fam. Code Ann. § 6.305(a)(1)-(2) (West 1998). In granting the special appearance, the court ordered Kathryn's petition for divorce dismissed in its entirety, leaving her to seek a property division, and orders for the conservatorship, possession, and support of her children in another jurisdiction.

## DISCUSSION

Kathryn contests the district court's finding that Jay is not subject to the jurisdiction of Texas courts. We will first address her argument that the district court erred when it found that Texas was not the last marital residence of the parties.

### Standard of Review

■■■ The existence of personal jurisdiction is a question of law, but proper exercise of that jurisdiction must sometimes be preceded by the resolution of underlying factual disputes. *Daimler–Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 715 (Tex.App.—Austin 2000, pet. dism'd w.o.j.). We determine the appropriateness of the district court's resolution of those disputes by an ordinary sufficiency of the evidence review based on the entire record. *Conner v. ContiCarriers & Terminals, Inc.*, 944 S.W.2d 405, 411 (Tex. App.—Houston [14th Dist.] 1997, no writ). If the court's order is based on undisputed or otherwise established facts, we conduct a *de novo* review of the order. *Id.* A defendant who challenges a court's exercise of personal jurisdiction through a special appearance carries the burden of negating all bases of personal jurisdiction. *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex.1985).

■■■ When a trial court rules on a special appearance, the losing party should request findings of fact. Tex.R. Civ. P.

296; *Daimler–Benz*, 21 S.W.3d at 715. If no findings are present in the record, all facts necessary to support the judgment of the trial court are implied. *Daimler–Benz*, 21 S.W.3d at 715. When a complete reporter's record exists, however, these implied findings are not conclusive and an appellant may challenge the sufficiency of the evidence to support them. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989). When such points are raised, the standard of review to be applied is the same as that to be applied in the review of jury findings or a trial court's findings of fact. *Id.*

■■■ We will set aside a finding of the trial court only if the finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *Runnells v. Firestone*, 746 S.W.2d 845, 849 (Tex.App.—Houston [14th Dist.] 1988, writ denied). In reviewing such a point of error, we must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. *Ames v. Ames*, 776 S.W.2d 154, 158–59 (Tex.1989); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). In considering the evidence, if a finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the finding should be set aside, regardless of whether some evidence supports it. *Watson v. Prewitt*, 159 Tex. 305, 320 S.W.2d 815, 816 (1959); *King's Estate*, 244 S.W.2d at 661.

■■■ If evidence supports the implied findings of fact, we must uphold the trial court's judgment on any legal theory supported by the findings. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990); *Point Lookout West, Inc. v. Whorton*, 742

S.W.2d 277, 278 (Tex.1987); *Runnells,* 746 S.W.2d at 848. This is so regardless of whether the trial court articulates the correct legal reason for the judgment. *Harrington v. Railroad Comm'n,* 375 S.W.2d 892, 895 (Tex.1964); *Fish v. Tandy Corp.,* 948 S.W.2d 886, 891–92 (Tex.App.—Fort Worth 1997, writ denied); *Marifarms Oil & Gas, Inc. v. Westhoff,* 802 S.W.2d 123, 125 (Tex.App.—Fort Worth 1991, no writ). We review the legal conclusions supporting the judgment to determine whether they are correct as a matter of law. *Lawrence v. Kohl,* 853 S.W.2d 697, 699 (Tex.App.—Houston [1st Dist.] 1993, no writ).

### *Texas Long–Arm Jurisdiction*

■ Texas courts may exercise jurisdiction over a nonresident defendant if the Texas long-arm statute authorizes the exercise of jurisdiction and if the exercise of jurisdiction comports with due process. *Daimler–Benz,* 21 S.W.3d at 714 (citing *Guardian Royal,* 815 S.W.2d at 226). In a suit for dissolution of a marriage, a court of this state may acquire jurisdiction over a nonresident spouse if Texas was the parties' last marital residence or if there is any basis consistent with the state and federal constitutions for exercise of personal jurisdiction. Tex. Fam.Code Ann. § 6.305(a). Once a Texas court acquires jurisdiction under section 6.305(a), it also acquires jurisdiction in a suit affecting the parent-child relationship. *Id.* §§ 6.305(b), 102.011 (West Supp.2001). In her first point of error, Kathryn urges that the trial court erred in finding that Texas was not the last marital residence of the Goodenb-

ours and that no other basis exists for the constitutional exercise of personal jurisdiction over Jay in this proceeding.[4] We will address both arguments in turn.

### I. *Last Marital Residence*

The Family Code does not define the term last marital residence, and case law interpreting section 6.305(a)(1) is sparse. In *Cossey v. Cossey,* 602 S.W.2d 591 (Tex. Civ.App.—Waco 1980, no writ), the court held that it would require more than occasional visits by one spouse with the partner and the children at the other spouse's residence *during marital separation. Id.* at 595. The *Cossey* court also noted that one commentator had suggested that last marital residence implies "a permanent place of abode by the spouses." *Id.* In *Scott v. Scott,* 554 S.W.2d 274 (Tex.Civ. App.—Houston [1st Dist.] 1977, no writ), the court held that marital cohabitation in Texas from November to February was sufficient to create a last marital residence, bringing the nonresident spouse within Texas long-arm jurisdiction. *Id.* at 277.

■ In applying the term "last marital residence," we should acknowledge that more and more frequently one spouse may, by choice or necessity, work in a state or country apart from the family unit for a period of time. A work separation, where spouses live apart to pursue professional opportunities, must be distinguished from a marital separation when spouses have decided to dissolve their marriage. Much as a military member may be on

---

4. In her pleadings, Kathryn relied on section 102.011 of the Family Code as a basis for long arm jurisdiction, and she includes the trial court's failure to find jurisdiction under this statute in her first point of error. *See* Tex. Fam.Code Ann. § 102.011. The trial court heard evidence and based its ruling solely on section 6.305(a), which we rule was tried by consent. *See* Tex.R. Civ. P. 67; *Temperature*

*Sys., Inc. v. Bill Pepper, Inc.,* 854 S.W.2d 669, 673–74 (Tex.App.—Dallas 1993, writ dism'd by agr.). Because of our disposition of the court's ruling on that statute, we do not find it necessary to address appellant's argument that the trial court erred in failing to find that the children resided in Texas as a result of the acts or directives of Jay.

temporary assignment elsewhere, one spouse may, for a time, pursue a work assignment away from the other family members. The family decision to endure a work separation may include consideration of what schooling or other opportunities are best for the children. Because the family has made the decision to remain an intact unit, the fact that the spouses live apart does not mean that a marital residence no longer exists. As long as the parties choose to maintain a marriage, there will be a marital residence somewhere.

■■■ To address the first point of error, we must determine the location of the Goodenbours' last marital residence. There are only three possible choices: Washington, New Zealand, or Texas. It is undeniable that every member of this family left the state of Washington several years ago. It is also clear that only Jay has any significant contact with New Zealand. While it may be true that Jay initially assumed that his family would follow him to New Zealand, neither Jay nor Kathryn sought to end their marriage when it became apparent that Kathryn and the children were not relocating to New Zealand.[5]

Kathryn and the children moved to Austin because she found employment there; she and the children lived there for approximately two years while the parties maintained their long-distance marriage. Jay argues that he never intended to live in Texas. However, there is evidence that he intended to maintain his marriage and his family while they were living in Texas: Jay returned to Austin five times to celebrate his wedding anniversary, family

birthdays, and Christmas vacations. During these trips, the parties lived together as man and wife. Jay continued to try to persuade Kathryn and the children to move to New Zealand; Kathryn continued to try to persuade Jay to find employment in Austin. Where was the marital residence while they faced these joint decisions in their marriage? All the evidence suggests that it was in Austin, even though Jay never agreed to work there. This was the classic commuter marriage.

At the very least, Jay acquiesced in his family's relocation to Austin. While Kathryn and Jay were apart, they had daily email communications and weekly phone conversations discussing school arrangements for the children, the effects of continuous moves on the children's development in school, work arrangements for Kathryn, and appropriate housing for the family. Jay always kept his personal belongings in the family residence in Austin, both before and after they purchased a home there. He traveled to Austin for family occasions and undertook domestic chores while he was there.

Jay played a major role in purchasing a home for the family in Austin. Jay participated with Kathryn in her search for a suitable home, encouraging her to find a house that would be comfortable and appropriate for the children and in a desirable school district. He completed the necessary financial applications for a mortgage and gave Kathryn his power of attorney to enable her to close on the property in his absence. Jay argues that he was simply trying to ensure that his family had the best available housing by offering his financial support. However, Jay did not

---

5. In overruling Kathryn's *forum non conviens* plea, the New Zealand court that granted Jay's request for a divorce noted that Kathryn would not be inconvenienced if it entered a decree affecting only the marital status of the parties because the division of marital property, conservatorship, and support of the children would have to be handled in the forum more convenient to her, presumably Texas.

merely guarantee or co-sign the loan; he took title to the house with Kathryn. Jay directed that the closing papers be delivered to an attorney of his choice for review. After the family moved into the new house, Jay undertook domestic chores, such as unpacking boxes, painting the living room, and installing a garage door opener. Jay participated in normal social activities with his family when he was in Austin. He conceded in his special appearance affidavit that his trips to Austin were made for the purpose of "keeping his marriage alive." This family bore all the characteristics of a functioning family unit living in Austin, even though one of the spouses worked in New Zealand. In addition, Jay and Kathryn filed a joint tax return in 1998 listing Austin as their residence.

In light of the family and marital activities centered in Austin, we conclude that Texas was the last marital residence of the Goodenbours. All members of the family were located in Austin, except Jay, and he was there with the family when his work in New Zealand permitted. While his trips to Austin were not frequent or regular (the evidence shows that over two years he was in Austin five times for a total of forty days), they were purposeful and were designed to keep the marriage and the family unit intact. We conclude that the trial court erred in its application of section 6.305(a)(1) of the Family Code and hold that Texas is the parties' last marital residence.

Having found the long-arm statute to be satisfied, we next consider whether the exercise of personal jurisdiction over Jay comports with federal due process.

### Personal Jurisdiction

 Federal due process protects a person's liberty interest from being subject to binding judgments in a forum with which he has established no meaningful contacts, ties, or relations. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Under the federal constitutional test of due process, a state may assert personal jurisdiction over a nonresident defendant only if the defendant has purposefully established minimum contacts with the forum state, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* at 476, 105 S.Ct. 2174; *see also Tele-Ventures, Inc. v. International Game Tech.,* 12 S.W.3d 900, 907 (Tex.App.—Austin 2000, pet. denied). Central to the issue of due process "is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Burger King,* 471 U.S. at 474, 105 S.Ct. 2174.

### A. Minimum Contacts

 The minimum contacts analysis has been refined into two types of jurisdiction: (1) general and (2) specific. General jurisdiction exists when the defendant's contacts with the forum state are continuous and systematic, even if the cause of action does not arise from or relate to activities conducted within Texas. *TeleVentures, Inc.,* 12 S.W.3d at 907. For general jurisdiction, the minimum contacts analysis is more demanding, requiring a showing of substantial activities within the forum state. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990). Therefore, we must determine that there are either minimum contacts sufficient to confer specific jurisdiction or continuous and systematic contacts sufficient to confer general jurisdiction.

 To establish specific jurisdiction, the cause of action must arise out of

or relate to the nonresident defendant's contact with the forum state, and the conduct must have resulted from that defendant's purposeful conduct, not the unilateral conduct of the plaintiff or others. *TeleVentures, Inc.,* 12 S.W.3d at 907. Thus, in analyzing minimum contacts for the purpose of determining Texas courts' specific jurisdiction, we focus on the relationship among the defendant, the forum, and the litigation. *Id.*

Under the minimum contacts test for specific jurisdiction, we must determine whether appellee has had purposeful contacts with the forum state, thus invoking the benefits and protections of its laws. *Guardian Royal,* 815 S.W.2d at 226. This requirement ensures that a nonresident defendant will not be haled into a jurisdiction based solely upon random or fortuitous contacts or the "unilateral activity of another party or a third person." *Id.* As long as the contact creates a substantial connection with the forum state, even a single act can support jurisdiction, but a single act or occasional acts may be insufficient to establish jurisdiction if their nature and quality and the circumstances of their commission create only an attenuated connection with the forum. *Burger King,* 471 U.S. at 475 n. 18, 105 S.Ct. 2174. In determining whether a nonresident defendant's contacts are random and fortuitous, the Texas Supreme Court has looked at whether the contacts are based upon the unilateral acts of the plaintiff or if the defendant participated in an act that resulted in a contact. *Dawson–Austin v. Austin,* 968 S.W.2d 319, 321, 326 (Tex. 1998); *CSR Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.1996).

In *Dawson–Austin,* the Texas Supreme Court held that the district court did not have personal jurisdiction over the nonresident respondent. 968 S.W.2d at 326. The husband moved to Texas after separating from his wife and individually purchased a residence and opened bank accounts without any participation or cooperation from his wife. *Id.* at 327. He then filed for divorce. *Id.* at 326. The court held that the husband had unilaterally moved to Texas and had purchased the residence *without the involvement* of the wife and therefore concluded that the nonresident wife in no way purposely availed herself of the privilege of owning property in this state. *Id.* at 327 (citing *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174).

The case at hand is distinguishable from *Dawson–Austin.* Unlike the respondent in that case, Jay was voluntarily involved in the purchase of property in Texas, which was bought expressly for the purpose of *establishing a residence for his family.* He went house-hunting with Kathryn on numerous occasions and executed a power of attorney to facilitate the purchase of the family home, which was to be held jointly in his and his wife's name. These activities occurred at a time when the family was operating as an intact unit, albeit one affected by a commuter marriage. The purchase was completed and Jay became a record owner of real estate in this state.

Ownership of real property in Texas is an important consideration in any minimum contacts analysis. *See Shaffer v. Heitner,* 433 U.S. 186, 208, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). Jay's purchase of a family home in Texas invoked the benefits and protection of the laws of the state of Texas in relation to his ownership of that property, as well as the laws regarding marital property.

The evidence as a whole shows that Jay's contacts with Texas were not the result of the unilateral acts of Kathryn. Jay was part of an intact family unit; his

wife and children resided in Texas. He spent time in the family home on a regular basis. The couple's income tax return for the time period in question reflected Austin as the family residence, while at the same time Jay filed a nonresident return in New Zealand. Jay participated in the purchase of a family residence in Texas and jointly held title to the property, where his personal belongings remained until the breakup of the marriage. Therefore, we conclude that Jay had sufficient minimum contacts with the State of Texas to subject himself to specific jurisdiction. Having satisfied the first prong of the personal jurisdiction test, we must now determine whether the exercise of jurisdiction satisfies the traditional notions of fair play and substantial justice.

## B. Fair Play and Substantial Justice

Having found that Jay had sufficient minimum contacts with Texas, we next turn to whether the exercise of jurisdiction in Texas is reasonable. To determine whether jurisdiction is reasonable, we evaluate the following factors: (1) the burden on the appellee, (2) Texas's interest in adjudicating the dispute, (3) appellant's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174; *Guardian Royal*, 815 S.W.2d at 231.

There is no evidence in the record showing that litigation in Texas would be unfair or unreasonable to Jay. Although there is a significant geographical distance between the parties' current residences, distance alone is not sufficient to defeat jurisdiction. *Guardian Royal*, 815 S.W.2d at 231. Jay made several trips to Texas in the fourteen months preceding the filing of this cause of action, which demonstrates that travel to Texas does not impose an unreasonable and unfair burden. His employer pays for four round-trip tickets annually to the United States and he has accumulated numerous frequent flyer miles, lessening any financial burden that may be imposed on him.

Furthermore, Texas has a strong interest in adjudicating this dispute because it involves a parent-child relationship and protection of the rights of children within the state, as well as the disposition of Texas real property. *See In the Interest of S.A.V.*, 837 S.W.2d 80, 84, 87 (Tex.1992). Generally, a family relationship is among those matters in which the forum state has such a strong interest that its courts may reasonably make an adjudication affecting the parent-child relationship even though one of the parties to the relationship may have had no personal contacts with the forum state. *Id.* at 84. Consequently, due process permits adjudication of the custody and visitation of a child residing in the forum state without a showing of minimum contacts on the part of the nonresident parent. *Id.* There is no dispute that Kathryn and Jay's children have been residing in Austin since August of 1997. Moreover, because Jay and Kathryn own real property in this state, Texas has a strong interest in serving as the forum for the adjudication of this suit. A state always has an interest in assuring the marketability of property within its borders as well as providing a procedure for resolution of disputes involving the possession of that property. *Shaffer*, 433 U.S. at 208, 97 S.Ct. 2569.

Finally, Kathryn's interest in obtaining convenient and effective relief suggests that Texas is the appropriate forum in which to adjudicate this matter. It would be more convenient for Kathryn to litigate

the dispute in Texas, the state where she and her children reside, than it would be for her to go to New Zealand, a foreign nation to which she has no connection. Unlike Jay, Kathryn has no access to free travel to New Zealand. Furthermore, with regard to the interest of the judicial system in obtaining the most efficient resolution of this dispute, it should be noted that other than Texas and New Zealand, Washington serves as the only other possible forum for handling the dispute. Given the fact that neither party now has a tie to that state, Washington clearly is an inappropriate choice as a forum.

Thus, we conclude that Jay's contacts with Texas are sufficient, particularly considering the quality and nature of his contacts, to confer specific jurisdiction over him. Furthermore, subjecting Jay to the jurisdiction of Texas courts is reasonable under the circumstances and does not offend the traditional notions of fair play and substantial justice. Given his activities and voluntary involvement with the family, and his joint ownership of the Texas residence, Jay should reasonably anticipate being haled into court in Texas in a suit pertaining to the dissolution of the marriage. Accordingly, we sustain Kathryn's first point of error. Having concluded that there are sufficient contacts to subject Jay to personal jurisdiction in Texas, we do not need to reach Kathryn's second point of error.

## CONCLUSION

We conclude that Texas is the last marital residence and that Jay has sufficient minimum contacts with Texas to subject him to personal jurisdiction here. We reverse the judgment of the district court and remand the cause for further proceedings.